Filed 9/28/23  P. v. McCalipp CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>LONTTAEVEON JAYVON McCALIPP,<br><br>     Defendant and Appellant. | B319589<br><br>(Los Angeles County<br>Super. Ct. No. LA092439) |

Appeal from judgment of the Superior Court of Los Angeles County, Martin Larry Herscovitz, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In January 2020, Lonttaeveon Jayvon McCalipp (McCalipp) fatally shot Jonathan McLinn (McLinn) outside the Red Tie gentlemen's club in Van Nuys, California. A jury convicted McCalipp of first degree murder and possession of a firearm by a felon. The jury also found true the special allegation that McCalipp had "personally and intentionally discharge[d] a firearm" in committing the murder, within the meaning of Penal Code section 12022.53, subdivision (d).[1] The trial court sentenced McCalipp to 50 years to life in prison.

McCalipp now asks us to reverse his convictions, advancing four arguments. First, his trial attorney rendered ineffective assistance by withdrawing a motion to suppress certain of his statements allegedly obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Second, the trial court abused its discretion in permitting the prosecution to present at trial a 14-second video posted on McCalipp's Instagram account depicting him with a gun on his lap nine days prior to the murder. Third, the cumulative prejudice resulting from his attorney's allegedly ineffective assistance and the court's purported error in admitting the Instagram video mandates reversal. Fourth, and finally, under *New York Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. __ [142 S.Ct. 2111, 213 L.Ed.2d 387] (*Bruen*), his conviction for possession of a firearm by a felon violates his rights under the Second and Fourteenth Amendments.

We are not persuaded by McCalipp's arguments challenging his convictions. McCalipp fails to demonstrate any prejudice resulting from his ineffective assistance claim or from the court's ruling admitting the Instagram video—whether considered

---

[1] Unless otherwise indicated, subsequent statutory references are to the Penal Code.

2

individually or cumulatively.  Nor are we persuaded that we should part company with the post-*Bruen* decisions confirming the constitutionality of California's prohibition on the possession of firearms by convicted felons.

Alternatively, McCalipp contends that—even if we do not reverse his convictions—we still must remand his case for resentencing because the trial court committed three sentencing errors:  (1) the court erred by failing to apply section 654 to stay punishment on McCalipp's felon-in-possession conviction; (2) the court abused its discretion by relying on improper factors in denying the prosecution's motion to dismiss the section 12022.53, subdivision (d) firearm enhancement; and (3) the court erred by failing to dismiss the firearm enhancement sua sponte pursuant to section 1385, subdivision (c)(2)(C), which provides that the court "shall" dismiss an enhancement that "could result in a sentence of over 20 years."  (§ 1385, subd. (c)(2)(C).)

We conclude that section 654 does not require a stay of punishment on McCalipp's felon-in-possession conviction because substantial evidence supports that McCalipp possessed the firearm at issue prior to the shooting.  We conclude further that the trial court properly relied on permissible factors—including the nature and circumstances of the offense—in denying the prosecution's motion to dismiss the firearm enhancement.  And we agree with our Division Seven colleagues, as well as with the First and Fourth Districts, that section 1385, subdivision (c)(2)(C) does not require a trial court to dismiss an enhancement where the court determines that doing so would endanger public safety.

Accordingly, we affirm the judgment.

3

# FACTUAL SUMMARY AND PROCEDURAL HISTORY[2]

## A.  *The Shooting*

In the early morning hours of January 31, 2020, McLinn and two friends, Andy Solarzno and Andrew Mayfield attempted to enter the Red Tie club.  Because McLinn was heavily intoxicated, Arootin Mahmudi, one of the club's two security guards, would not permit him entry.  Mahmudi told McLinn to "hang up for a little bit" outside, and that once he "fel[t] a little b[e]tter," he could enter the club.

At approximately 2:44 a.m.—while McLinn was waiting outside the club—Mahmudi and the other on-duty security guard, Armen Tomanian, heard six gunshots from approximately 100 feet away.  Mahmudi saw McLinn on the ground and another man standing on top of him.  Tomanian saw McLinn fall down as if he had been shot and another person who appeared to be the shooter.  Tomanian then saw the shooter move towards McLinn's head and shoot him three more times.

Mahmudi ran toward McLinn and demanded that the shooter drop his weapon.  The shooter failed to do so, and—fearing for his life and the lives of others on the street—Mahmudi fired nine .40 caliber rounds at the shooter.  Tomanian, also using .40 caliber bullets, fired four rounds at the shooter.  The shooter then entered a four-door sedan.  Two other people entered the sedan, and the car drove away from the scene.

Mahmudi and Tomanian then approached McLinn, and Mahmudi observed multiple gunshot wounds in McLinn's chest and head areas.  Neither Mahmudi nor Tomanian saw weapons of any kind near McLinn's body.  Detectives recovered only .40-caliber

---

[2] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

shell casings at the scene. A subsequent autopsy confirmed that McLinn had suffered nine gunshot wounds, several of which—including a gunshot to the back of his head—were fatal.

### B. *The Charges and Pretrial Litigation*

### 1. The Information

The District Attorney's Office filed an information charging McCalipp with one count of first degree murder (§§ 187, subd. (a), 189, subd. (a)) (count 1) and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 3).[3]

The information alleged further that McCalipp "*personally and intentionally discharged a firearm*" in the commission of the murder, "within the meaning of . . . [s]ection 12022.53[, subdivision] (d)."[4]

---

[3] No "count 2" appears in the information.

[4] Section 12022.53, subdivision (d) provides: "Notwithstanding any other law, a person who, in the commission of a felony specified in [enumerated statutes] personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in [s]ection 12022.7, or death, to a person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)

The information also alleged firearm use enhancements pursuant to subdivisions (b) and (c) of section 12022.53, as well as a criminal street gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). Because the trial court subsequently struck or dismissed each of these additional enhancements, we do not discuss them further in our analysis.

### 2. Prosecution's Motion To Dismiss the Firearm Enhancement Pursuant to Special Directives 20-08, 20.08.1, and 20-14

In advance of McCalipp's preliminary hearing, the deputy district attorney moved to dismiss the firearm use enhancement, citing section 1385[5] and three special directives—Special Directives 20-08, 20.08.1, and 20-14—issued by then-newly elected Los Angeles County District Attorney George Gascón.

Special Directive 20-08 "instructed deputy district attorneys in pending cases to move to dismiss or withdraw sentence enhancement allegations." (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 486 (*Nazir*).) Special Directives 20.08.1 and 20-14, in turn, clarified the specific language deputy district attorneys should use in such motions to dismiss.

The motion filed in McCalipp's case complied with the letter of the special directives; however, the deputy district attorney also stated in the motion that she "[could not] reconcile" the policies established by the special directives with certain Penal Code provisions, portions of the California Rules of Professional Conduct and Rules of Court, and "decades of decisional law and professional practice."

At McCalipp's preliminary hearing, the deputy district attorney reiterated that she "[did] not feel that based on the facts and [her] view of [the] case, that it would be in the interest of

---

[5] Section 1385 provides, in relevant part, "[t]he judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." (§ 1385, subd. (a).) The section "applies to a motion to dismiss 'the entire action or, as here, only an enhancement allegation.' [Citations.]" (*Nazir, supra*, 79 Cal.App.5th at pp. 490–491.)

justice to dismiss [the] special allegation[ ]." The court then denied the motion.

### 3. Defense Motion To Exclude Any Statements Obtained in Violation of *Miranda*

McCalipp filed several pretrial motions in limine, including a motion "to exclude any statements allegedly made by . . . McCalipp pursuant to his *Miranda* rights being violated, or in the alternative, hold [an Evidence Code section] 402 hearing to determine the admissibility of said statements." (Boldface & capitalization omitted.)

At the pretrial hearing, however, McCalipp's counsel withdrew the motion, explaining that she "[did not] believe there [were] any issues with" McCalipp's rights pursuant to *Miranda, supra,* 384 U.S. 436.

## C. *The Trial*

The prosecution presented several categories of trial evidence rebutting McCalipp's contention that detectives had misidentified him as the shooter, including: (1) witness testimony, (2) a video recording of portions of McCalipp's postarrest interview with detectives, (3) surveillance and body camera footage of the shooting, (4) materials from McCalipp's Instagram account, and (5) cell phone location data.

### 1. Witness Testimony Identifying McCalipp as the Shooter

Jerrick Henry (Henry), McLinn's uncle, testified that he showed Mayfield—who had accompanied McLinn to the Red Tie the morning of the shooting—two photographs of McCalipp that McLinn's mother obtained from Instagram following the shooting.

Henry stated Mayfield confirmed that the person in the photographs shot and killed McLinn.[6]

### 2. McCalipp's Postarrest Statements

Law enforcement arrested McCalipp on March 26, 2020. Detective Eloy Navarro, the lead detective on the case, testified that McCalipp used his left hand to complete paperwork during the booking process. Detectives then interviewed McCalipp for approximately an hour and a half. The prosecution played excerpts of this interview for the jury at trial.

At the outset of the interview, detectives advised McCalipp of his rights pursuant to *Miranda*, *supra*, 384 U.S. 436, including that he had the right to remain silent and the right to consult with an attorney. McCalipp acknowledged his *Miranda* rights and then told detectives that he had been drinking at the El Tejano restaurant in North Hollywood, California, during the hours immediately prior to the shooting. He repeatedly denied, however, that he ever had visited—or even knew the location of—the Red Tie.

Nearly halfway through the interview—in response to detectives' continued insistence that he had visited the Red Tie—McCalipp stated:

---

[6] The prosecution called Mayfield, who was in custody on unrelated charges, to testify at trial. He denied ever having identified McCalipp as the shooter and claimed to have only a limited memory of the morning of the shooting. He also testified that if others perceived him to be a "snitch," he and his family could face retaliation.

8

"You said why did you go.  On PDL[7] I didn't go.  So why do you guys keep saying this?  On Bloods, on PDL I don't wanna talk to y'all no more."

Detectives continued questioning McCalipp after he made this statement, and McCalipp continued answering the detectives' questions.  He persisted for the remainder of the interview in denying ever having visited the Red Tie or otherwise being involved in McLinn's shooting.

### 3.    Surveillance and Body Camera Footage

The prosecution introduced video footage from surveillance cameras covering the El Tejano restaurant's parking lot and front sidewalk during the approximately two hours prior to the shooting.  The footage captures a man wearing a long-sleeved red shirt or sweatshirt, jeans, and a black-and-gold bandanna getting in and out of a blue, four-door sedan.  The sedan has a visible sticker in the lower left corner of its back window.  Detective Navarro testified that, based on the vehicle's body style, the sedan appeared to be an Audi.

The prosecution also played video from security cameras covering the Red Tie's parking lot and from the body camera worn by one of the club's on-duty security guards.  The footage depicts—from a significant distance—what appears to be a male individual in a long-sleeved red shirt or sweatshirt, jeans, and bandanna exit a dark-colored, four-door sedan with a sticker in the lower left corner of its back window.  The footage then shows the individual in the red shirt shoot McLinn nine times, using his left hand to fire the gun.

---

[7] McCalipp admitted to detectives during the interview that he belonged to the "PDL" gang, which other materials in the record suggest refers to the "Pasadena Denver Lanes Blood" gang.

The prosecution argued in closing that the combination of the El Tejano and Red Tie video footage confirmed that detectives correctly had identified McCalipp as the shooter:

"[Deputy District Attorney]: But when it comes down to, in this case, is you have a video. You have a video, and the video alone shows you [an individual with the] same buil[d as McCalipp], same clothes, same pattern on the distress[ed] jeans, same left-hand[edness], same body type, and the same car with the same decal with the same driver, with the same sunroof."

### 4. Materials from McCalipp's Instagram Account

The trial court permitted the prosecution to present to the jury several brief videos obtained from McCalipp's Instagram account, as well as a number of messages sent to and from the account.

McCalipp's face clearly is visible in each of the videos, and his counsel acknowledged that McCalipp himself posted the videos. One such video—posted the day before the murder—depicts McCalipp in a long-sleeved red shirt or sweatshirt and a black-and-gold bandanna. Another video, lasting 14 seconds and posted nine days prior to the murder, depicts McCalipp with a firearm in his lap, again wearing a long-sleeved red shirt and a black-and-gold bandanna.

In addition, the prosecution introduced a messaging conversation between McCalipp's Instagram account and another Instagram user dated 12 days prior to the murder. In the conversation thread, the other user writes to McCalipp's account, "I'm at red tide strip club." McCalipp's account responds, "Send me . . . [t]his addy," and the other user responds with the address

10

of the Red Tie.[8]  The messaging record indicates that the conversation culminated in a video call between McCalipp's account and the other Instagram user.

The prosecution also presented a messaging conversation from McCalipp's Instagram account from the night after the shooting.  The conversation contains an embedded photograph of McLinn's face.  The conversation begins with the following message sent from McCalipp's account:  "Wasn't bl."  Another Instagram user responds, "Nah he didn't bang. . . . His brother['s] from 60s tho[ugh]."  McCalipp's account then responds, "Damn, that's brazy."  Another message sent from McCalipp's account that same day—also accompanied by a photograph of McLinn—states, "Jon [i.e., the victim's first name] a legend, but we ain't no ordinary people!!"

### 5.    Cell Phone Location Data

Finally, the prosecution introduced cell phone location data demonstrating that McCalipp had been traveling in the general direction of the Red Tie prior to the shooting.

### D.    *Verdicts and Sentencing*

The jury found McCalipp guilty of first degree murder (count 1) and possession of a firearm by a felon (count 3).  The jury also found true the special allegation that McCalipp "*personally* and intentionally discharged a firearm, . . . within the

---

[8] The user appears to have inverted the last two numbers in the Red Tie club's address, directing McCalipp to 158*23* Stagg Street, rather than 158*32* Stagg Street.  McCalipp, however, did not object to Detective Navarro's testimony that the address provided in the messaging conversation was "the same address of the Red Tie gentlemen's club . . . where Mr. McLinn was shot."

meaning of . . . [section] 12022.53, subdivision (d)" in committing the murder.

The trial court sentenced McCalipp to 50 years to life on count 1, consisting of 25 years to life for the murder charge and another consecutive 25 years to life for the firearm use enhancement.

The court explained that—although it was aware of its discretion to strike the firearm use enhancement under section 1385—it declined to do so because the circumstances of the murder demonstrated that dismissal of the enhancement would endanger public safety:

"[T]he real reason why the defendant poses a danger, and there is a likelihood that he would hurt or kill someone in the future, is the mere manner in which this crime was committed. It was basically an execution in the style of a hit man. I mean, shooting someone at close range in the body, having them fall to the ground, stepping closer to them and delivering three bullets to the head, something you only see in the Godfather or Goodfell[as]. You don't see murders like that every day that are so cold and callous[, with] use of a firearm in the fashion that the defendant did in this case. So I have no doubt given the opportunity, that the defendant would kill again and is extremely dangerous to public safety."

With respect to count 3, the court imposed a midterm sentence of two years to run concurrently with the sentence on count 1.

McCalipp timely appealed.

12

# DISCUSSION

## A. *Challenges to Convictions*

McCalipp mounts four challenges to his convictions, arguing: (1) his trial counsel rendered ineffective assistance by withdrawing a motion to suppress certain of his postarrest statements; (2) the trial court erred in admitting the Instagram video depicting him with a gun on his lap nine days prior to the murder; (3) the cumulative prejudice resulting from his counsel's purported ineffective assistance and the trial court's admission of the video mandates reversal; and (4) his conviction for possession of a firearm by a felon violates his rights under the Second and Fourteenth Amendments.

### 1. McCalipp Fails To Demonstrate Prejudice From His Trial Counsel's Decision To Withdraw the Suppression Motion

First, McCalipp contends that we must reverse his convictions because his trial attorney rendered ineffective assistance of counsel by withdrawing a motion to suppress statements he made to detectives after he had purportedly invoked his rights under *Miranda, supra,* 384 U.S. 436. McCalipp, however, has failed to demonstrate any resulting prejudice.

"In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." ' [Citations.]  It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that

13

absent the errors the result would have been different.  [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 (*Mesa*).)

McCalipp urges that by telling the detectives, "I don't wanna talk to y'all no more," he invoked his *Miranda* rights.  As a result, he argues, his counsel should have moved to suppress all statements he made to detectives following that invocation.  McCalipp contends further that his counsel's failure to do so prejudiced him because, after invoking *Miranda*, he responded to detectives' questions with statements that "wreaked of falsity"— including denying that he had ever visited the Red Tie, denying that he had gotten out of the blue Audi at the El Tejano restaurant, and denying that he had access to his Instagram account.  He insists that "[t]he jury reasonably inferred from these statements that [he] had been dishonest with the detectives because he was conscious that he was guilty of McLinn's murder."

McCalipp ignores, however, that he represented repeatedly to the interviewing detectives that he had never visited the Red Tie before he purportedly invoked his right to remain silent.  McCalipp thus made substantially similar denials in response to detectives' inquiries both before and after his purported invocation of *Miranda*.

Moreover, the remaining trial evidence presented against McCalipp—including the surveillance camera footage, the Instagram messages directly linking McCalipp to the Red Tie and the victim, and the cell phone location data—was extremely inculpatory.  We therefore are not persuaded that there is a "reasonable probability" that suppression of the statements at issue would have changed the outcome of his trial.  (*Mesa*, *supra*, 144 Cal.App.4th at p. 1008; see *Strickland v. Washington* (1984) 466 U.S. 688, 694–695.)

14

Nor are we persuaded by McCalipp's contention that "the failure of [his] trial attorney to make a [suppression] motion was prejudicial even if the motion would have been denied because," in that circumstance, the "standard of prejudice [on appeal] would have been whether the evidence . . . was harmless beyond a reasonable doubt" under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Even assuming that *Chapman* rather than *Strickland* applies, the strength of the trial evidence against McCalipp demonstrates that admission of the postarrest statements of which he complains was harmless beyond a reasonable doubt.

Accordingly, we conclude that any error by McCalipp's trial counsel in withdrawing the motion to suppress was harmless.[9]

### 2. *Any Error by the Trial Court in Admitting the Instagram Video Was Harmless*

Next, McCalipp contends that the trial court committed reversible error by admitting a 14-second video he posted to his Instagram account nine days before the murder, depicting him with a gun in his lap.[10] (*People v. Byers* (2021) 61 Cal.App.5th 447, 453 (*Byers*), review den. May 12, 2021, S267918 ["[w]e review a trial court's ruling admitting evidence for abuse of discretion"].) We disagree.

---

[9] In light of our conclusion, we need not resolve whether McCalipp's statement that he "[did not] wanna talk to [the detectives] no more" constituted an unambiguous assertion of his Fifth Amendment right to remain silent, or whether—as the Attorney General contends—the statement constituted merely an " 'expression of frustration with the investigators' repeated refusal to accept his' earlier denial[s]" of culpability insufficient to invoke that right.

[10] In his reply brief, McCalipp describes the Instagram video as a "photograph." We assume this is a typographical error.

McCalipp first insists that the gun in the video was irrelevant because the prosecution argued at trial that McLinn's shooter used a .40 caliber gun, but failed to introduce any evidence that the handgun in the Instagram video was a .40 caliber weapon. The video, however, clearly showed McCalipp's face and depicted him wearing clothing similar to that worn by the shooter. Thus, even if the gun was irrelevant, the video as a whole was relevant to establishing McCalipp's identity as the perpetrator. (See Evid. Code, § 210.)

McCalipp's next argument—that the presence of the gun rendered the video unduly prejudicial—presents a closer question. The Attorney General does not dispute that the prosecution failed to present any evidence that the gun was, in fact, the murder weapon. Moreover, other Instagram videos admitted at trial that did not contain images of a gun depicted McCalipp wearing the clothing matching that worn by the shooter. These facts diminish the unique probative value of the Instagram video and arguably render it unduly prejudicial.

But even if the trial court erred in admitting the video, we are not persuaded that "it is reasonably probable the verdict would have been more favorable to [McCalipp] absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 [absent fundamental unfairness, state law error in admitting evidence is subject to the traditional "reasonable probability" test set forth in *People v. Watson* (1956) 46 Cal.2d 818].) McCalipp complains that the video unfairly painted him as a "gun-toting gang member who is a menace to society," but he freely admitted his gang membership to detectives during his postarrest interview (prior to his alleged invocation of his right to remain silent). Moreover, as set forth, *ante*, the other trial evidence offered against McCalipp was very damaging. We therefore conclude that any error by the trial court

16

in admitting the disputed Instagram video was harmless.  (See *Partida*, *supra*, 37 Cal.4th at p. 439.)

Finally, we are unpersuaded by McCalipp's argument that admission of the video violated his due process rights under the Fourteenth Amendment.[11]  "To prove a deprivation of federal due process rights, [McCalipp] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.  'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]  'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)

The Instagram video at issue supported the permissible inferences by the jury that (1) McCalipp possessed and wore clothes similar to those worn by the shooter, and (2) detectives thus correctly identified McCalipp as the shooter.  Therefore, "[t]his is not 'one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair.' [Citations.]" (*Byers*, *supra*, 61 Cal.App.5th at p. 455.)

---

[11] We therefore necessarily reject McCalipp's contention that, because admission of the Instagram video violated his Fourteenth Amendment right to due process, we should apply the "harmless beyond a reasonable doubt" standard set forth in *Chapman*, *supra*, 386 U.S. 18, 24 in assessing whether admission of the video resulted in prejudice.

### 3. McCalipp's Cumulative Error Argument Fails

McCalipp urges that, even if insufficient to establish prejudice in isolation, the combined effect of (1) the trial court's purported error in admitting the Instagram video, and (2) his counsel's alleged error in failing to move to suppress his statements to detectives requires that we reverse his convictions. But the remaining trial evidence was so damaging that we find the cumulative effect of any such errors "too slight to warrant reversing" McCalipp's convictions. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.)

### 4. McCalipp's Conviction for Possession of a Firearm by a Felon Does Not Violate the Second or Fourteenth Amendments

Finally—relying on *Bruen, supra*, 597 U.S. ___ [142 S.Ct. 2111]—McCalipp argues that we must reverse his conviction under section 29800, subdivision (a)(1) for possession of a firearm by a felon because the statute impermissibly infringes upon his rights under the Second and Fourteenth Amendments. Like other courts to have considered similar claims, we reject McCalipp's facial challenge to the constitutionality of section 29800, subdivision (a)(1). (See, e.g., *People v. Ceja* (Aug. 30, 2023, G061609) ___ Cal.App.5th ___ [2023 WL 5602746]; *People v. Odell* (2023) 92 Cal.App.5th 307 (*Odell*); *People v. Alexander* (2023) 91 Cal.App.5th 469 (*Alexander*).)

" 'On a facial challenge, we will not invalidate a statute unless it "pose[s] a present total and fatal conflict with applicable constitutional prohibitions." ' [Citation.]" (*Alexander, supra*, 91 Cal.App.5th at p. 474.) Section 29800, subdivision (a)(1) does not present such a " ' "fatal conflict." ' " (*Alexander, supra*, at p. 474.)

"All constitutional rights have limits," and "[t]he Second Amendment right [to keep and bear arms] is ' "not a right to keep

18

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." ' " (*Odell*, *supra*, 92 Cal.App.5th at p. 316, quoting *Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2128].) The prohibition against felons possessing firearms is "one boundary on this right" (*ibid.*), and nothing in *Bruen* calls into question that boundary. *Bruen* held that "New York's concealed carry licensing regime, which required applicants to demonstrate proper cause to get a license, was unconstitutional 'in that it prevents *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms.' [Citation.]" (*Alexander*, *supra*, 91 Cal.App.5th at p. 474, italics added, quoting *Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2156].) Indeed, "[i]t was no accident the *Bruen* majority repeated the qualifier 'law-abiding' some 13 times. [Citation.] People who have been convicted of a felony are not 'law-abiding.' " (*Odell*, *supra*, 92 Cal.App.5th at p. 317.)

Accordingly, we conclude that section 29800, subdivision (a)(1)'s prohibition on the possession of firearms by felons is facially constitutional.

### B. *Purported Sentencing Errors*

Having rejected McCalipp's various challenges to his convictions, we turn next to the arguments he raises concerning three purported sentencing errors. Because we disagree that the trial court made any such errors, we affirm the judgment.

### 1. The Trial Court Did Not Err by Declining To Stay Punishment on Count 3 Under Section 654

McCalipp first contends that, because "[t]here [was] no substantial evidence that [he] possessed [the] firearm [used in the shooting] before the murder," section 654 required the trial court

19

to stay the prison term for his possession of a firearm conviction (count 3). We disagree.

Section 654 provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).)

"Section 654 therefore ' "precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts." ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).) Whether possession of a firearm " ' "constitutes a divisible transaction from the offense in which [a defendant] employs the weapon depends upon the facts and evidence of each individual case." ' " (*Ibid.*) When the evidence " 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense' "—such as when a defendant shoots an officer with a gun he wrested from him—section 654 bars a separate punishment for the possession of the weapon. (*Jones*, *supra*, at p. 1144.) On the other hand, "section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*Jones*, *supra*, at p. 1145.)

Whether "section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence

20

of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, 103 Cal.App.4th at p. 1143.)

McCalipp urges that, because "the Red Tie surveillance video shows the shooter standing with McLinn and another individual at the open trunk of a blue car immediately before the shooting occurs[,] . . . [¶] . . . if [McCalipp] was in fact the shooter, he could have obtained the firearm that he used to shoot McLinn from the open trunk of the car immediately before he fired the gun." But the evidence obtained from McCalipp's Instagram account strongly suggests that he planned McLinn's murder in advance, supporting the inferences that (1) he obtained the firearm he used to kill McLinn in advance of the shooting, and (2) he "arrived at the scene of [the] primary crime already in possession of [that] firearm." (*Jones*, *supra*, 103 Cal.App.4th at p. 1145.)

Accordingly, we conclude that substantial evidence supports the trial court's decision not to apply section 654 to stay punishment on McCalipp's count 3 conviction.

###     2.     The Trial Court Acted Within Its Discretion in Denying the Motion To Dismiss the Firearm Enhancement

Next, McCalipp argues that "the trial court abused its discretion when it denied the prosecution's motion [under section 1385] to dismiss the [firearm use] enhancement . . . [¶] . . . [b]ecause the trial court merely deferred to the filing deputy district attorney's opinion—which was contrary to the official position of the District Attorney's Office." (Boldface omitted & capitalization added & omitted.) We disagree.

McCalipp does not dispute that, notwithstanding any special directives issued by the District Attorney's Office, the trial court retained discretion to deny the motion. (See *Nazir*, *supra*, 79 Cal.App.5th at 499 ["[c]ontrary to the position of the district

21

attorney . . . a prosecutor's motion to dismiss an enhancement under section 1385 is not 'a constitutionally protected exercise of prosecutorial discretion,' and the trial court may deny such a motion"].) And the record does not support McCalipp's contention that the court improperly deferred to the deputy district attorney or failed to consider the special directives. To the contrary, the transcript of the hearing on the motion reflects that the court considered permissible factors—including the circumstances of the offense and the special directives—in reaching its ruling:

"The Court: [Deputy district attorney], if I'm reading your motion correctly, it appears that you do not feel that based on the facts and the view of your case, that it would be in the interest of justice to dismiss [the] special allegation[ ], and for that reason, the motion to dismiss any special allegations is denied. [¶] . . . [¶] . . . Just in relation to the motion, I did read the motion. The court listened to both arguments. The court's feeling, with the different policies and positions and based on all of these factors, I am not granting the dismissal of the special allegation[ ]."

The court thus expressly clarified that it had not based its ruling on the personal feelings of the individual deputy district attorney. Instead, it relied on "the motion" (which set forth relevant legal authorities and the circumstances of the offense), "both arguments [for and against dismissing the enhancement]," and "the different policies and positions" (i.e., the special directives)—all of which it was proper for the court to consider. (See *Nazir*, *supra*, 79 Cal.App.5th at pp. 495–497.)

Accordingly, we find unconvincing McCalipp's arguments that the trial court abused its discretion in denying the prosecution's motion to dismiss the firearm enhancement.

### 3. Section 1385, Subdivision (c)(2)(C) Does Not Mandate Dismissal of the Firearm Enhancement

Finally, McCalipp contends that—irrespective of any motion by the prosecution—the plain language of section 1385, subdivision (c)(2)(C) mandates dismissal of the enhancement. McCalipp concedes that he failed to raise this issue before the trial court. He urges, however, that, by failing to strike the enhancement sua sponte, the court imposed an unauthorized sentence that we have the power to reverse on appeal. (See *People v. Anderson* (2023) 88 Cal.App.5th 233, 239, fn. 7 (*Anderson*), review granted Apr. 19, 2023, S278786.) We are not persuaded that the court imposed an unauthorized sentence on McCalipp by declining to dismiss the firearm enhancement.

Section 1385 provides, in relevant part:

"(c)(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion [to dismiss an enhancement] under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

"[¶] . . . [¶]

"(C) The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."  (§ 1385, subds. (c)(1) & (c)(2)(C).)

Pointing to the word "shall" in the last sentence of section 1385, subdivision (c)(2)(C), McCalipp argues that a trial court must dismiss a sentencing enhancement where, as here, imposition of the enhancement could result in a sentence greater than 20 years.

We agree that, in isolation, the subdivision's language could support McCalipp's contention.  But "[w]e do not 'consider the statutory language "in isolation." ' [Citation.]" (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 294 (*Mendoza*), review den. Apr. 26, 2023, S279144.)  " 'Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . ." ' [Citation.]  'That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' " ' [Citation.]" (*Ibid.*)

Like our colleagues in Division Seven and the First and Fourth Districts, we therefore conclude that—considered in its broader statutory context—section 1385, subdivision (c)(2)(C) does not compel a trial court to dismiss all sentencing enhancements that might result in a sentence of over 20 years. (See *Mendoza, supra,* 88 Cal.App.5th at p. 291 ["[w]e conclude that section 1385[, subdivision] (c)(2)(C) does not mandate dismissal of an enhancement when the court finds that dismissal would endanger public safety"]; *Anderson, supra,* 88 Cal.App.5th at p. 241, review granted; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 18, review den. Mar. 22, 2023, S278429; see also *People v. Walker* (2022) 86 Cal.App.5th 386, 396, review granted Mar. 22, 2023,

24

S278309[12] ["[i]n our view, the text and purpose of section 1385 in general, and Senate Bill No. 81 in particular, as well as the canons of statutory construction, counsel in favor of concluding that the phrase 'all enhancements beyond a single enhancement shall be dismissed' in subdivision (c)(2)(B) does not obligate trial courts to automatically dismiss all but one enhancement whenever a jury finds multiple enhancements to be true"]; but see *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1097, fn. 6, review granted Apr. 12, 2023, S278894 [noting in dicta that "the Legislature has unambiguously provided that the . . . enhancement(s) [described in section 1385, subdivision (c)(2)(C)] 'shall be dismissed' "].)

In particular, we find persuasive the following analysis by the Fourth District in *Mendoza*:

"Section 1385[, subdivision] (c)(2) provides that in determining whether to dismiss an enhancement 'under this subdivision,' the court must consider nine listed mitigating circumstances if proven by the defendant [citation], 'unless the court finds that dismissal of the enhancement would endanger public safety' [citation].  That provision means that if the court finds that dismissal of an enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances.  [Citation.]  The 'shall be dismissed' language in section 1385[, subdivision] (c)(2)(C), like the language of all of the listed mitigating circumstances, applies only if the court

---

[12] The Supreme Court granted review concerning only whether "the amendment to . . . section 1385, subdivision (c) that requires trial courts to 'afford great weight' to enumerated mitigated circumstances [citation] create[s] a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds dismissal would endanger public safety." (*People v. Walker*, S278309, Supreme Ct. Mins., Mar. 22, 2023.)

25

does not find that dismissal of the enhancement would endanger public safety. That interpretation gives meaning to the language in section 1385[, subdivision] (c)(2) requiring the court to consider whether dismissal 'would endanger public safety,' and it consequently avoids rendering that language surplusage.

"In contrast, [defendant's] interpretation gives no effect to the clause 'unless the court finds that dismissal of the enhancement would endanger public safety.' [Citation.] That is, Mendoza's interpretation would require a court to dismiss any enhancement when application of the enhancement could result in a sentence greater than 20 years *regardless of whether dismissal would endanger public safety*. We avoid interpretations that render statutory language surplusage. [Citation.] We also must avoid interpretations that lead to absurd results. [Citation.] . . . On [defendant's] interpretation, dismissal of his firearm enhancement was statutorily required even though (1) the statute expressly invites consideration of whether dismissal of the enhancement would endanger public safety, and (2) the court found that it would. That is, according to [defendant's] interpretation, the statute required the sentencing court to endanger public safety. That cannot be what the Legislature intended." (*Mendoza*, *supra*, 88 Cal.App.5th at p. 296, fn. & italics omitted.)

We therefore conclude that a trial court need not dismiss an enhancement under section 1385, subdivision (c)(2)(C) where it determines that doing so would endanger public safety. Here, the trial court made precisely such a finding, and McCalipp does not challenge that determination on appeal. Accordingly, we reject his contention that section 1385, subdivision (c)(2)(C) requires that we reverse the judgment and remand for resentencing.

26

## DISPOSITION

The April 4, 2022 judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENDIX, J.